IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
AUGUSTA DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | * | |
| | * | |
| v. | * | Case No.: 1:12-cr-253 |
| | * | |
| CARL LAMONT BRANDON. | * | |

O R D E R

Presently pending before this Court is Carl Lamont Brandon's ("Defendant") Motion for a New Trial. (Doc. no. 62.) Upon consideration of Defendant's motion, the Government's response, the record, and the relevant legal authority, the motion is **DENIED**.

**I. Facts and Procedural Background**

Defendant was indicted on December 6, 2012 for violation of 28 U.S.C. § 922(g), Felon in Possession of a Firearm. (Doc. no. 1.) Defendant entered a plea of "Not Guilty" at his arraignment on December 20, 2012. (Doc. no. 7.) Following his arraignment, Defendant filed a number of pre-trial motions, including motions to preserve record as to race, to preserve evidence, for release of Brady materials, for disclosure of electronic surveillance, for Jencks Act material, and to participate in voir dire. (Doc. nos. 10-15.) In addressing these motions, the United States

Magistrate Judge noted that Defendant did not file any specific motions for discovery. (Doc. no. 22.) Instead, the Government provided Defendant with "expanded" discovery, which included reports from the Bureau of Alcohol, Tobacco, Firearms, and Explosives, the Columbia County Sheriff's Office, and the United States Attorney's Office; all known statements by Defendant; and results from any scientific tests. (Id.) The court additionally required that the Government provide Defendant with any Jencks Act material no later than seven days before trial. (Id.)

On August 2, 2013, Defendant moved to suppress (1) statements he made to the arresting deputy and (2) a Hearing Waiver form executed by Defendant on October 16, 2012 and any statements made on or about the signing of that form. (Doc. no. 30.) In its response, the Government agreed not to introduce the Hearing Waiver during its case-in-chief, but reserved the right to use the waiver or statements made to the parole officer at that time for impeachment purposes on rebuttal. (Doc. no. 32 at 1.) Following the suppression hearing on August 8, 2013, the Government sent defense counsel a letter clarifying its intentions with regard to Defendant's statements to his parole officer. (Doc. no. 62-2.) In the letter, the Government reiterated that it would not introduce, during its case-in-chief, any "statements made by [Defendant] to his parole officer . . . following his arrest, *beyond the Waiver of Final Hearing*

2

*which we have agreed not to introduce."* (Id. (emphasis added).) The Government additionally informed defense counsel that the parole officer was to bring any additional documents related to Defendant's supervision to trial and that it would provide defense counsel with any such materials prior to the parole officer's testimony. (Id.)

During jury selection, the Government was allowed seven peremptory strikes and Defendant eleven. The jury pool was made up of thirty-two members, twelve of whom were African-American. The impaneled jury of fourteen, including the two alternate jurors, was made up of four African-Americans. The Government used its strikes on two African-American males, four African-American females, and one white female; Defendant used his eleven strikes on seven white males, one white female, one Indian female, one Asian male, one African-American male, and one African-American female. (Id.)

Defendant, at the close of the striking process, raised a Batson challenge arguing that the Government's pattern of striking African-American venire members and the Government's "lack of other justification" created an inference of discrimination. (Doc. no. 65, "Trial Transcript," at 30.) The Court asked defense counsel to present any other factors demonstrating discrimination, which Defendant did not do, and

3

accordingly ruled that Defendant failed to make out a prima facie case of discrimination. (Id. at 30-34.)

Following voir dire, Defendant filed a Motion in Limine to exclude the testimony of Defendant's parole officer in the Government's case-in-chief, as well as any documentary evidence relating to her testimony, arguing that such matters were irrelevant to the issues to be tried and unduly prejudicial.[1] (Id. at 51, 55.) This Court deferred ruling pre-trial, deciding instead to address the issue in the context in which it would be offered. (Id. at 75.) The Government did not introduce the parole officer's testimony during its case-in-chief. Once defense counsel informed the Court that it would be calling witnesses, the Government handed defense counsel the materials supplied by the parole officer. (Doc. no. 62 at 8.) Included in those materials were the parole officer's notes regarding a conversation with Defendant from October 10, 2012,[2] two days after his arrest. (Id., Ex. C.) Defendant did not testify at trial.

At the close of Defendant's case, the Government called Defendant's parole officer to the stand to rebut the testimony

---

[1] Before trial, the parties stipulated that Defendant was a convicted felon as of the date of his arrest and that the firearm found in his car upon arrest traveled in interstate commerce, leaving Defendant's knowledge of the gun's presence in his vehicle the only issue to be tried. (Doc. nos. 36, 37.)

[2] There is some uncertainty in the record as to whether Defendant made the statement on October 8, 9, or 10. For purpose of consistency, the Court uses October 10, 2012 because that is the date listed in the parole officer's report. (Doc. 62, Ex. C.)

4

given by Defendant's witnesses. (Trial Transcript at 153.) Defense counsel objected, arguing that the materials were disclosed impermissibly late and that they contained an admission that violated Miranda. (Id. at 154-56.) Counsel for the Government responded that Defendant knew of the conversation with the parole officer and did not move to suppress any statements from that conversation before trial, that Defendant's earlier motion to suppress only addressed statements taken while signing the Hearing Waiver form one week after his arrest, and that the materials were properly disclosed because the Government had only received them at the beginning of trial. (Id. at 156, 162.) The Court allowed the testimony, denying Defendant's motion for leave to file a motion to suppress. (Id. at 165.)

Defendant was found guilty on August 13, 2013, and sentenced to 120 months in custody. (Doc. nos. 53, 75.)

## II. Applicable Law

Motions for new trial are governed by Federal Rule of Criminal Procedure 33. Rule 33 authorizes the Court, upon a motion by the defendant, to vacate judgment and grant a new trial "if the interest of justice so requires." FED. R. CRIM. P. 33(a).

If a motion for new trial is based upon errors committed during trial, the defendant has the burden of showing that (1) some error was in fact committed and (2) that such error was prejudicial to him. United States v. Delaughter, No. 8:07-cr-201, 2007 WL 3034645, at *1 (M.D. Fla. Oct. 16, 2007) (citing United States v. Simms, 508 F. Supp. 1188, 1203 (W.D. La. 1980)). Even if a defendant can make such a showing, a new trial is only warranted where the error affects the defendant's substantial rights and the fairness of trial. Id.; see also Fed. R. Crim. P. 52(a). An error affects a defendant's substantial rights if it "probably had a substantial influence on the jury's verdict." United States v. Stephens, 365 F.3d 967, 977 (11th Cir. 2004) (internal quotation marks omitted).

### III. Discussion

Defendant bases his motion on two claims: (1) the Court erred in denying Defendant's Batson challenge; and (2) the Court erred by allowing testimony regarding statements made by Defendant to his parole officer. The Court addresses each in turn.

### A. Batson Challenge

Defendant alleges that the Government committed a Batson violation by engaging in a pattern of striking African-American jurors. Following the striking process, the Court heard

6

Defendant's challenge and ruled that he did not meet the prima facie case required by Batson v. Kentucky, 476 U.S. 79 (1986).

To successfully mount a Batson challenge, the party alleging the violation must meet a three part test. Id. at 96-98. First, the defendant must establish a prima facie case sufficient to support an inference of discrimination. Id.; Johnson v. California, 545 U.S. 162, 168 (2005). If such a showing is made, the striking party must then provide a race-neutral explanation for its strikes. Batson, 476 U.S. at 96-98. Finally, the district court must evaluate the persuasiveness of the reasons given and decide whether, based on a totality of relevant circumstances, the objecting party has met its burden. Id.

The Supreme Court in Batson v. Kentucky provided specific guidance on what a defendant must show in order to set forth a prima facie case:

> To establish such a case, the defendant first must show that he is a member of a cognizable racial group and that the prosecutor has exercised peremptory challenges to remove from the venire members of the defendant's race. Second, the defendant is entitled to rely on the fact, as to which there can be no dispute, that peremptory challenges constitute a jury selection practice that permits those to discriminate who are of a mind to discriminate. Finally, the defendant must show that these facts and any other relevant circumstances raise an inference that the prosecutor used that practice to exclude the veniremen from the petit jury on account of their race.

Batson, 476 U.S. at 96 (internal citations and quotation marks omitted).

Upon making his Batson challenge, Defendant argued that the disproportionate number of strikes against African-Americans and lack of justification provided by the Government[3] were sufficient to meet the prima facie case. Beyond this, Defendant provided no additional evidence of discrimination.

Defendant's statistical argument focuses on the number of strikes used by the Government against African-American veniremen. The jury pool was made up of thirty-two persons, twelve of whom were African-American, or 37.5 percent. The Government had seven strikes available to it, and used six of those strikes against African-Americans, or 85.7 percent.[4] Defendant had eleven strikes available to him, using nine against non-African-Americans, or 81.8 percent. The final jury, including alternates, had four African-Americans, or 28.5 percent.

---

[3] Defendant cannot use the lack of justification from the Government to meet his burden. See United States v. Stewart, 65 F.3d 918, 925 (11th Cir. 1995) ("No party challenging the opposing party's use of a peremptory strike — whether that party be the government, a criminal defendant, or a civil litigant — is entitled to an explanation for that strike, much less to have it disallowed, unless and until a prima facie showing of racial discrimination is made."). Accordingly, the Court focuses solely on Defendant's statistical argument.

[4] Consistent with Eleventh Circuit precedent, the Court considers the total number of strikes used, including those against alternates. United States v. Hill, 643 F.3d 807, 838 (11th Cir. 2011) ("[T]he law of this circuit is that in determining whether a prima facie case has been established the peremptory strikes used to select alternates are to be considered together with those used to select the initial 12 jurors.").

8

The Eleventh Circuit Court of Appeals has consistently held that bare statistics are insufficient to meet the prima facie case: "Of course, the prima facie case determination is not to be based on numbers alone but is to be made in light of the totality of the circumstances." United States v. Hill, 643 F.3d 807, 839 (11th Cir. 2011); see also Cent. Ala. Fair Hous. Ctr., Inc. v. Lowder Realty Co., 236 F.3d 629, 636-37 (11th Cir. 2000) ("The number of persons of a particular race struck takes on meaning *only* when coupled with other information such as the racial composition of the venire, the race of others struck, or the voir dire answers of those who were struck compared to the answers of those who were not struck."); United States v. Allison, 908 F.2d 1531, 1538 (11th Cir. 1990) ("In making out a prima facie case, 'the defendant must point to more than the bare fact of the removal of certain venirepersons and the absence of an obvious valid reason for the removal.'" (quoting United States v. Young-Bey, 893 F.2d 178, 179 (8th Cir. 1990)).

The Eleventh Circuit has additionally held that no Batson violation occurred in cases where the statistics were similar to those in the instant case. For example, in United States v. Campa, 529 F.3d 980 (11th Cir. 2008), the Government used nine out of its eleven available strikes. Of the nine strikes used, seven were against African-Americans, or 77.7 percent of strikes used and 63.6 percent of all available strikes. Id. at 989. This

9

is compared to 85 percent of strikes available and used in Defendant's case. Additionally, the final jury selected in <u>Campa</u> included four African-Americans out of sixteen total jurors (including alternates), or 25 percent. <u>Id.</u> Defendant's jury included four African-Americans out of fourteen total jurors, or 28.5 percent.

Moreover, in <u>United States v. Ochoa-Vasquez</u>, 428 F.3d 1015 (11th Cir. 2005), the court explained that statistical factors are not the sole guide in determining a <u>Batson</u> violation. There, the objecting party focused, like Defendant, exclusively on statistical differentials to establish a pattern of discrimination. <u>Id.</u> at 1045 n.39. The Eleventh Circuit, in assessing the claim, looked to (1) "whether the striker struck all of the relevant racial or ethnic group from the venire, or at least as many as the striker had strikes[;]" (2) "whether there is a substantial disparity between the percentage of jurors of a particular race or ethnicity struck and the percentage of their representation on the venire[;]" and (3) "whether there is a substantial disparity between the percentage of jurors of one race or ethnicity struck and the percentage of their representation on the jury." <u>Id.</u> at 1045 (internal quotation marks omitted). While it is true that a disparity exists between the percentage of strikes used and the representation of African-Americans on the jury, the Government

10

did not use all strikes available to it on African-American jurors. In fact, two additional African-American jurors were struck by *Defendant*, leading to the possibility that more African-Americans could have been on the panel but for those strikes. Additionally, when comparing the available jury pool to that selected, it is clear that there is almost no disparity.

The court in <u>Ochoa-Vasquez</u> went on to explain that the above three factors "do not constitute an exhaustive list of potentially relevant factors," noting that "the subject matter of the case may be relevant if it is racially or ethnically sensitive." <u>Id.</u> at 1045 n.39. That is certainly not the case here, where Defendant was charged with possessing a firearm as a felon, and there was but one issue for the jury to decide: Defendant's knowledge.

Defendant relies heavily on <u>Miller-El v. Dretke</u>, 545 U.S. 231 (2005), in his motion. There, the prosecutor used ten of the eleven available strikes against African-American venire members, or 91 percent. <u>Id.</u> at 240-41. In <u>Miller-El</u>, however, of a 108-person panel with twenty African-Americans (18.5 percent), only one served. <u>Id.</u> Additionally, aside from nine African-American jurors excused for cause or by agreement, ten were struck by the prosecution. <u>Id.</u> Thus, by statistics alone, <u>Miller-El</u> can be distinguished from the instant case.

Although Defendant attempts to use Miller-El for the proposition that "disproportionate striking is easily sufficient to permit an inference that the Government racially discriminated" (doc. no. 62 at 14), a careful reading of Miller-El reveals that the Supreme Court relied on a multitude of factors beyond statistics in reaching its conclusion. "More powerful than these bare statistics, however, are side-by-side comparisons" of the African-Americans struck to the white jurors selected to serve. Miller-El, 545 U.S. at 241. In the case at bar, Defendant failed to produce any such comparison either at trial or in his motion. The Supreme Court further emphasized that "widely known evidence of the general policy of the Dallas County District Attorney's Office to exclude black venire members from juries" weighed heavily in favor of the "appearance of discrimination[.]" Id. at 253. No such policy is alleged here. Finally, in Miller-El, the Supreme Court was able to assess differences in the questions posed by the prosecution based on race. Id. at 255. Here, the Court allowed both defense counsel and the Government to ask follow up questions during voir dire. The Government's only two questions related to benign issues.[5] (Trial Transcript at 8, 22.)

---

[5] The Government's questions related to whether a particular juror had ever been represented by defense counsel's law firm and what type of instructor a particular juror was at work. (Trial Transcript at 8, 22.)

Accordingly, and based on a thorough review of the relevant Supreme Court and Eleventh Circuit precedent, the Court concludes that Defendant has failed to make a prima facie showing of discrimination, and his motion for new trial on this issue is **DENIED**.

B. **Motion to Suppress**

Defendant next contends that the Court erred in allowing the testimony of Defendant's parole officer regarding statements made following his arrest and that the Government violated both Federal Rule of Criminal Procedure 16 and the Court's Scheduling Order by failing to deliver the documents containing the statement until trial. For the reasons stated below, both arguments fail.

Under Federal Rule of Criminal Procedure 12(b)(3), a party must make any motion to suppress evidence *prior* to trial. FED. R. CRIM. P. 12(b)(3) (emphasis added). Furthermore, "[a] party waives any Rule 12(b)(3) defense, objection, or request not raised by the deadline the court sets under Rule 12(c) or by any extension the court provides." FED. R. CRIM. P. 12(e). Here, Defendant does not dispute that he attempted to raise his motion and objection after trial began. (Doc. no. 69 at 7.) Instead, Defendant relies on the second sentence of Rule 12(e), which allows the Court, in its discretion, to grant relief from the waiver "[f]or good cause[.]" Id. And "[w]hile it *may* have been

*permissible* for the district court to consider the motion despite its untimeliness, [Defendant] has cited no case in which a district court was required to do so under similar circumstances." See United States v. Taylor, 792 F.2d 1019, 1025 (11th Cir. 1986) (holding that the district court did not abuse its discretion in denying a motion to suppress where the "cause" provided by the defendant was a change in counsel three weeks before trial). Simply put, Defendant has not met his burden of demonstrating good cause.[6]

Defendant argues that he could not have moved to suppress the statement any sooner because he did not know of its existence until the defense called its first witness. Although Defendant disputes that he "actually used the words attributed to him" and does not "agree[] with the rendition of the custodial interview which appears in [the parole officer's] notes and report" (doc. no. 62 at 21), he was certainly aware that a conversation took place. In fact, Defendant made a timely motion to suppress statements made to this same parole officer "in connection with" his execution of a waiver form.[7] (Doc. no.

---

[6] The Court need not address whether the parole officer's testimony violated Defendant's Fifth Amendment rights because his motion was untimely, he waived any objection, and he failed to show cause to excuse the waiver.

[7] Defendant's pre-trial motion to suppress addressed statements made "a week or more after his arrest" but neglected to address any prior statements. (See doc. no. 30 at 6.)
Additionally, Defendant alleges that he could "not have moved to suppress this alleged admission with any greater specificity, because [Defendant] and his counsel had not been notified the alleged admission

14

30 at 8.) Defendant's failure to relay said conversation, in whatever version he recalled, to defense counsel does not warrant a new trial.

Moreover, it is clear defense counsel knew of a conversation between Defendant and the state parole officer in the days leading up to trial. In a letter to defense counsel dated August 9, 2013, the Government responded to defense counsel's question regarding "statements made by [Defendant] to his parole officer, . . . *following his arrest, beyond the Waiver of Final Hearing* which we have agreed not to introduce." (Doc. no. 62, Ex. B (emphasis added).) In light of this letter and the fact that Defendant does not dispute that a conversation with his parole officer occurred, "there is no reason [Defendant's] counsel should not have previously discovered the basis for this motion to suppress." See United States v. Jones, 241 F. App'x 676, 678 (11th Cir. 2007).

Finally, the Court addresses Defendant's argument that the Government's disclosure of the statement was untimely under Federal Rule of Criminal Procedure 16 and the Court's Scheduling Order. Rule 16 requires the government to disclose, upon

---

existed." (Doc. no. 62 at 21.) Defendant's motion to suppress the later statement, however, was not made with any great specificity either. There, Defendant simply moved to suppress "any oral statement to the parole officer at or around the time the [waiver] form was executed[,]" but did not actually address the content of the statement. (Doc. no. 30 at 4.) Accordingly, and given the fact that Defendant clearly knew that a conversation with his parole officer took place, defense counsel could have moved to suppress that statement as well, but failed to do so.

15

Defendant's request, any relevant statement by the defendant. FED. R. CRIM. P. 16(a)(1)(A). While defense counsel is correct that Rule 16 imposes a continuing duty to disclose newly discovered evidence, it is apparent from the record that the Government met this burden to the best of its ability. The Government's letter to defense counsel dated August 9, 2013, states:

> I have included in our subpoena[8] to [the parole officer] a requirement that she bring any documents she prepared related to [Defendant's] supervision after his October 8, 2012, arrest to court with her on Monday. I plan to provide you with any such materials that qualify as Jencks Act materials prior to [her] testimony.

(Doc. no. 62, Ex. B.) Accordingly, defense counsel was notified of the potential for such evidence and was given the evidence promptly upon the Government's receipt.

Furthermore, a "necessary condition precedent" to this right to disclosure is the Government's intent to use the statement at trial. United States v. Perez-Oliveros, No. 05-0017-WS, 2006 WL 780119, at *3 (S.D. Ala. March, 28, 2006); FED. R. CRIM. P. 16(a)(1) ("[T]he government must disclose to the defendant the substance of any relevant oral statement made by the defendant . . . if the government intends to use the statement at trial."). Here, the testimony was used solely to impeach Defendant's witness, so the Government would not have

---

[8] The Government sent the subpoena on August 9, 2013, the same day that it sent the letter to defense counsel. (Doc. no. 67, attachment 1.)

16

formed the intent to use the materials until after hearing said testimony. In fact, in arguing its motion in limine to exclude both the parole officer's testimony and the contents of the state parole file prior to trial, defense counsel stated that "[w]e don't intend to create any kind of contradiction with the alleged statement even if it had been made[,]" which would potentially render the parole officer's testimony unnecessary. (Trial Transcript at 74.)

Upon the foregoing, the Court finds that Defendant failed to show cause to excuse his untimely motion and the Government's disclosure of the parole file was timely under the circumstances.

## IV. Conclusion

Defendant's motion for new trial (doc. no. 62) is hereby **DENIED**.

**ORDER ENTERED** at Augusta, Georgia, this 21st day of October, 2014.

HONORABLE J. RANDAL HALL
UNITED STATES DISTRICT JUDGE
SOUTHERN DISTRICT OF GEORGIA